**In the Matter of the Arbitration between MONEGASQUE DE REASSURANCES S.A.M. (MONDE RE), Petitioner,**

and

**NAK NAFTOGAZ OF UKRAINE and State of Ukraine, Respondents.**

No. 00 CIV. 6853(VM).

United States District Court, S.D. New York.

Sept. 4, 2001.

Michael O. Hardison, Snow, Becker, Krauss, P.C., David Spivak, Eaton & Van Winkle, New York City, for petitioner.

Martin Mendelsohn, Washington,, DC, Thomas Robert Snider, Orlando E. Vidal, Stroock & Stroock & Lavan LLP, New York City, for respondents.

## DECISION AND AMENDED ORDER

MARRERO, District Judge.

Petitioner Monegasque de Reassurances s.a.m. (Monde Re) ("Monde Re") is a business organized under the laws of Monaco. As subrogree to the rights of AO Gazprom ("Gazprom"), a Russian company, Monde Re petitions for an order confirming a foreign arbitral award, citing the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958 (the "Convention")[1] and claiming jurisdiction under the Foreign Sovereign Immunities Act (the "FSIA" or the "Act").[2]

Respondent NAK Naftogaz of Ukraine ("Naftogaz") moves to dismiss the petition for lack of personal jurisdiction, contending that it is a Ukrainian company with no contacts with New York or the United States and that the underlying contract and all operative events giving rise to the arbitral award occurred in Ukraine and neighboring countries. Respondent State of Ukraine ("Ukraine") separately moves to dismiss the petition on the grounds that (1) the Court lacks both subject matter and personal jurisdiction because Ukraine is immune from suit under the FSIA; (2) the Court should decline jurisdiction pursuant to the doctrine of forum non conveniens; and (3) Monde Re has failed to state a claim upon which relief can be granted.[3] For the reasons stated below, Ukraine's motion is granted on the ground of forum non conveniens. Naftogaz's motion is thereby rendered moot, and the petition is dismissed as to both respondents.

### FACTS

Except as otherwise noted, the Court finds the following facts to be undisputed

1. 21 U.S.T. 2517, T.I.A.S. No. 6997, 330 U.N.T.S. 3, implemented by and reprinted in the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 201–208.

2. 28 U.S.C. §§ 1330 and 1602–1611.

3. Ukraine states in its Notice of Motion that its motion to dismiss is submitted pursuant to Fed.R.Civ.P. 12(b)(1), (2), (3) & (6). The Court, however, fails to find an argument put forth by Ukraine concerning improper venue under Rule 12(b)(3). Ukraine did argue, however, that the petition should be dismissed on the ground of forum non conveniens—which is a separate and distinct matter from improper venue—as the doctrine rests on the inherent authority of the federal court. See Chambers v. NASCO, Inc., 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

for purposes of the pending motions herein.

In January 1998, Gazprom and AO Ukrgazprom ("Ukrgazprom"), a Ukrainian company, entered into a contract in Ukraine whereby Ukrgazprom agreed to transport natural gas across Ukraine through pipelines it operated and to deliver the gas to various foreign countries on behalf of Gazprom (the "Contract"). *See* Pet., ¶ 8. In exchange for Ukrgazprom's services, Gazprom promised to deliver approximately 235 million cubic meters of natural gas to Ukrgazprom. *See id.* In May 1998, Ukrgazprom and several other Ukrainian companies merged to form Naftogaz, which is the successor-in-interest to Ukrgazprom. *See id.,* ¶¶ 14, 16. Naftogaz is a company organized under the laws of Ukraine with its principal place of business in Kiev, Ukraine. *See id.,* ¶ 5.

In October 1998, Gazprom—to protect itself against the risk that Ukrgazprom might make an unauthorized withdrawal of natural gas in the course of the Contract—insured itself with the Sogaz Insurance Company ("Sogaz"), which reinsured the risk with Monde Re. *See id.,* ¶ 9. In 1999, a dispute arose as to whether Ukrgazprom had, in fact, improperly withdrawn approximately 1.48 billion cubic meters of natural gas. *See id.,* ¶ 11. Before the dispute had been resolved, Gazprom filed a claim with Sogaz. *See id.,* ¶ 12. Sogaz paid the claim and was reimbursed by Monde Re, which, as a result, became subrogated to the rights of Gazprom under the Contract. *See id.,* ¶¶ 12–13.

In accordance with an arbitration provision of the Contract, Monde Re and Naftogaz proceeded to arbitrate the dispute in the International Commercial Court of Arbitration in Moscow (the "ICCA"). *See id.,* ¶¶ 19–20. That court directed Naftogaz to pay a total of $88,374,401.49 to Monde Re. *See id.,* ¶ 21. Naftogaz's petition to annul the ICCA decision was refused.

Monde Re claims that Naftogaz has failed to pay any portion of the arbitral award and petitions this Court for an order confirming the award and directing entry of judgment in the full amount as against both Naftogaz and Ukraine. *See id.,* ¶ 22. Monde Re claims that Ukraine is (1) a major shareholder of Naftogaz; (2) a joint venturer with Naftogaz in several commercial enterprises; and (3) responsible under Ukrainian law for Naftogaz's obligations arising under the arbitral award. *See id.,* ¶¶ 26, 29.

Naftogaz disputes that it is controlled by Ukraine. Ukraine acknowledges that Naftogaz is an "open joint stock company" created pursuant to a Resolution of the Cabinet of Ministers of Ukraine and governed by a Charter approved by the Cabinet of Ministers. *See* Respondent State of Ukraine's Memorandum of Law in Support, dated Jan. 22, 2001 ("Ukraine's Memo"), at 3. Ukraine maintains, however, that while the shares of Naftogaz are owned by Ukraine, Naftogaz is a separate legal entity responsible for its own contracts and liabilities. *See id.* Ukraine points out that it was neither a signatory to the Contract containing the arbitration clause, nor a party to the arbitration. *See id.*

## DISCUSSION

### A. THE FSIA AND FORUM NON CONVENIENS

■ Before analyzing the case at bar under the doctrine of forum non conveniens, the Court feels that it is appropriate to address the application of this doctrine in a case arising out of the arbitration exception to foreign sovereign immunity. At first glance, a plausible argument might be made that the Convention as applied

under the FSIA—requiring signatory countries to recognize and enforce foreign arbitral awards between private parties and sovereign states—might limit in some way the authority of a federal court to decline jurisdiction on the basis of forum non conveniens. Upon reasoned examination of the issue, however, this argument fails.

This Court finds nothing to suggest that the FSIA affects the federal judiciary's inherent power to decline jurisdiction over complex and inconvenient lawsuits brought in the United States which implicate foreign parties only; require the application of foreign law; and entail no contacts with the interests of the United States. To the contrary, application of the doctrine of forum non conveniens—when appropriate in such cases—may promote the notion of comity upon which the FSIA is grounded.

■ The FSIA confers both subject matter and personal jurisdiction over foreign sovereign states for certain actions arising out of the private and commercial activities of those states. See 28 U.S.C §§ 1330, 1605. The doctrine of forum non conveniens separately affords federal courts the discretion to decline jurisdiction if the balance of the parties' private interests and the public interest concerns of the Court makes it clear that trying the case in the plaintiff's chosen forum would be inconvenient and unjust. See Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); Piper Aircraft Co. v. Reyno, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); Koster v. (American) Lumbermens Mut. Casualty Co., 330 U.S. 518, 527, 67 S.Ct. 828, 91 L.Ed. 1067 (1947); DiRienzo v. Philip Servs. Corp., 232 F.3d 49 (2d Cir.2000). In other words, both convenience and justice are best served when such an action would be tried in another forum where it could have appropriately been brought.

■ The power to decline jurisdiction under this doctrine is one that is inherent to the federal court. See Chambers, 501 U.S. at 44, 111 S.Ct. 2123. As Justice Jackson wrote in Gilbert, 330 U.S. at 507, 67 S.Ct. 839, "[t]he principle of forum non conveniens is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." Thus, jurisdiction under the FSIA and the doctrine of forum non conveniens are wholly independent of each other, yet often entail intertwining considerations and may serve complementary policies and purposes. See Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 490 n. 15, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) ("The [FSIA] does not appear to affect the traditional doctrine of forum non conveniens."); Blanco v. Banco Industrial de Venezuela, S.A., 997 F.2d 974, 977 (2d Cir.1993) (dismissing case arising under the FSIA on forum non conveniens grounds); Gould, Inc. v. Kuhlmann, 853 F.2d 445, 454 (6th Cir.1988) ("Forum non conveniens is not the same as jurisdiction and is a consideration independent of the FSIA."); Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A., 760 F.2d 390, 394 (2d Cir. 1985).

The FSIA codified a restrictive theory of foreign sovereignty, placing the determination of sovereign immunity—and jurisdiction in United States courts in applicable cases—in the judiciary. See Verlinden, 461 U.S. at 489, 103 S.Ct. 1962. The Act was designed to overcome claims of immunity and thereby confer jurisdiction over disputes involving foreign states and having some relation to the United States. See id. at 490, 103 S.Ct. 1962; Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne De Navigation (C.N.A.N.), 730 F.2d 195 (5th Cir.1984).

At the time of the Act's promulgation in 1976, only the waiver exception to sovereign immunity set forth in § 1605(a)(1) did not require that a suit bear some connection to the United States. The Supreme Court in *Verlinden, see* 461 U.S. at 490 n. 15, 103 S.Ct. 1962, noted that while the waiver provision may be seen as an exception to the normal application of the Act in this respect, the Court did not need to decide whether a foreign state, by waiving its immunity, could consent to suit based on activities wholly unrelated to the United States because the FSIA did not appear to affect the traditional doctrine of forum non conveniens. The Second Circuit reaffirmed this point, declaring:

> We are not concerned that United States courts will become the courts of choice for local disputes between foreign plaintiffs and foreign sovereign defendants and thus be reduced to "international courts of claims". The traditional doctrine of forum non conveniens is still applicable in cases arising under the Foreign Sovereign Immunities Act.

*Proyecfin,* 760 F.2d at 394 (citations omitted).

Under this analysis, the FSIA and forum non conveniens not only are compatible, they are complementary. As noted above, the Second Circuit in *Proyecfin* and *Blanco* remarked that the doctrine of forum non conveniens serves to keep the FSIA—and thus the jurisdiction of United States courts—from being overwhelmed by foreign parties. *See Blanco,* 997 F.2d at 977; *Proyecfin,* 760 F.2d at 394. If forum non conveniens were not applicable to actions under the FSIA, the federal courts would effectively be stripped of one tool that helps prevent this country's judicial system from becoming the courthouse to the world, or an international court of claims.

Indeed, concern about the abrogation of forum non conveniens under the FSIA should not be limited to United State courts. While the absence of the doctrine, which acts as a bulwark, could unnecessarily tax our overburdened system, it would also defeat a central purpose of the FSIA—to respect the sovereignty of foreign states—insofar as United States courts would, in some cases, derogate from the authority of foreign judicial systems that otherwise could appropriately exercise their own jurisdiction over such cases.

The amendment of the FSIA in 1988, when Congress added the arbitration exception codified in § 1605(a)(6), has not altered the doctrine of forum non conveniens in FSIA cases. Section 1605(a)(6) states that a party may bring an action to confirm an award made pursuant to an agreement to arbitrate between a sovereign state and a private party if the award is or may be governed by a treaty or other international agreement in force in the United States calling for the recognition and enforcement of arbitral awards. *See* 28 U.S.C. § 1605(a)(6).

The Convention, as implemented by chapter two of the FAA, is exactly the kind of treaty which the arbitration exception contemplates. *See Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1018 (2d Cir.1993). Chapter two requires that signatory states recognize and enforce foreign arbitral awards granted in other signatory states, unless there exists in the treaty one of the enumerated grounds for refusal of enforcement. *See* 9 U.S.C. § 201; Convention, Art. V.

In the context of jurisdiction sought under the arbitration exception of the FSIA, at least one court has found that it was obligated to grant a petition to recognize and enforce such an arbitral award. *See In re Chromalloy Aeroservices,* 939 F.Supp. 907 (D.D.C.1996). That decision,

however, is not incompatible with the doctrine of forum non conveniens. *Chromalloy* involved an arms transaction between Egypt and a United States manufacturer. *See id.* The case involved such extensive ties to the United States that forum non conveniens analysis would not have been applicable.

Furthermore, the Convention does not demand that signatory countries fundamentally alter their judicial processes in order to comply. In fact, Article III of the Convention states that the signatory states must recognize arbitral awards "in accordance with the rules of procedure of the territory where the award is relied upon." *See* Convention, Art. III. Because forum non conveniens is more procedural than substantive in nature, the Convention cannot be read as affecting the discretion of federal courts to decline jurisdiction where judicial economy, convenience and justice so compel. *See American Dredging Co. v. Miller,* 510 U.S. 443, 453, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994).

Moreover, actions arising under the Convention itself may be dismissed on the ground of forum non conveniens. *See e.g. Jain v. de Mere,* 51 F.3d 686 (7th Cir.), *cert. denied,* 516 U.S. 914, 116 S.Ct. 300, 133 L.Ed.2d 206 (1995); *CNA Reinsurance Co., Ltd. v. Trustmark Ins. Co.,* No. 01 Civ. 1652, 2001 WL 648948, at *5 (N.D.Ill. June 5, 2001); *Oil Basins, Ltd. v. Broken Hill Proprietary Co., Ltd.,* 613 F.Supp. 483 (S.D.N.Y.1985). Considering that the Convention does not affect the application of forum non conveniens, it would be highly peculiar if the practical inclusion of chapter two of the FAA into the FSIA somehow worked to alter the apparently comparable harmony between the FSIA and the forum non conveniens doctrine.

In this case, Monde Re claims that Ukraine should be estopped from disputing the convenience of United States courts for proceedings to enforce an arbitral award because Ukraine has already agreed that the United States is a convenient forum under the Convention, which provides that an award may be enforced in any of the signatory states. Monde Re's argument, however, reads too much into the language and purpose of the Convention.

It is simply unreasonable to say that the Convention intended, without explicit language to that effect, to invalidate wholesale portions of federal common law and procedural doctrine. Moreover, Monde Re's theory contradicts the very purpose of the Convention, which is to encourage enforcement of commercial arbitration agreements in international contracts and thus promote international trade. *See Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974).

Forcing the recognition and enforcement in Mexico, for example, in a case of an arbitral award made in Indonesia, where the parties, the underlying events and the award have no connection to Mexico, may be highly inconvenient overall and might chill international trade if the parties had no recourse but to litigate, at any cost, enforcement of arbitral awards in a petitioner's chosen forum. The Convention was intended to promote the enforcement of international arbitration so that businesses would not be wary of entering into international contracts. It would be counterproductive if such an application of the Convention gave businesses a new cause for concern.

This Court accordingly concludes that adoption of the FSIA's arbitration exception was simply not intended to alter the FSIA so that one component of the Act abrogated the doctrine of forum non conveniens while other provisions, invested

with no less standing and applicability, did not. Such a construction of the statute, would be extraordinary. To the contrary, the purpose of the 1988 amendment was not to fundamentally change the statute but to "fill the gaps" in the FSIA and "perfect the jurisdiction of the court". 131 Cong. Rec. S5363–04 (statement of Senator Mathias on S. 1071).

Although the arbitration exception does not include language that an action must have some connection to the United States, there is no reason to treat it any differently from the waiver exception. Congress found that "an agreement to arbitrate constitutes a waiver of immunity", *id.*, and as the Supreme Court intimated in *Verlinden*, 461 U.S. at 490 n. 15, 103 S.Ct. 1962, the waiver exception can not be read as an invitation to litigate all foreign disputes between foreign plaintiffs and foreign sovereign defendants in the courts of the United States.

### B. *APPLICATION OF FORUM NON CONVENIENS*

■ Courts analyze the forum non conveniens doctrine in two parts. First, an adequate alternative forum must exist. *See Gilbert,* 330 U.S. at 506–07, 67 S.Ct. 839; *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 46 (2d Cir.1996). If the Court finds that an adequate forum does exist, it then must determine, by balancing the private interests of the litigants and the public interest concerns of the Court, whether adjudication of the action in the chosen forum would be inconvenient and unjust. *See Gilbert,* 330 U.S. at 508–09, 67 S.Ct. 839.

#### 1. *Adequate Alternative Forum*

■ An alternative forum is ordinarily adequate if (1) the defendants are amenable to service of process there and (2) the forum permits litigation of the subject matter of the dispute. *See Ilusorio v. Ilusorio–Bildner,* 103 F.Supp.2d 672, 674 (S.D.N.Y.2000), *aff'd,* —— F.3d ——(2d Cir. 2001).

It is undisputed here that both Ukraine and Naftogaz are amenable to suit in Ukraine. *See* Affidavit of Volodymyr Kovtonuk, sworn to Jan. 22, 2001 ("Kovtonuk Aff."), ¶¶ 3, 5–8; Declaration of William Butler, sworn to Apr. 2, 2001 ("Butler Decl."), ¶ 54. Moreover, Ukrainian law specifically provides for the consideration of a petition to recognize and enforce a foreign arbitral award pursuant to the Convention and does not exempt the Ukranian government from such laws. *See* Supplemental Affidavit of Volodymyr Kovtonuk, sworn to June 1, 2001 ("Kovtonuk Supp. Aff."), ¶¶ 3–10; Respondent State of Ukraine's Reply Memorandum, dated June 1, 2001, at 11.

Monde Re claims, however, that Ukraine is not an adequate alternative forum on the ground that "Ukraine does not enjoy a reputable reputation." Petitioner's Memorandum of Law, dated Apr. 13, 2001 ("Petitioner's Memo"), at 18; Declaration of Michael O. Hardison, sworn to Apr. 13, 2001 ("Hardison Decl."), ¶ 65. It characterizes Ukraine as being "described as one of the most corrupt countries in the world", a corruption that Monde Re asserts—citing an editorial in *The New York Times*— extends to Ukrainian courts, "where power and money rule", and where Monde Re fears it could not receive a fair hearing in a case against the government and one of its public entities. *Id.,* ¶¶ 66–67.

■ Yet, Monde Re's conclusory allegations of corruption, whatever weight may be accorded them, are insufficient to render Ukraine an inadequate forum. For this Court to credit Monde Re's argument would require it effectively to pass value judgments on the adequacy of justice and the integrity of another sovereign state's

judicial system on the basis of no more than bare denunciations and sweeping generalizations.

■ Among its central ends, the forum non conveniens doctrine serves precisely to avert such unnecessary indictments by our judges condemning the sufficiency of the courts and legal methods of other nations. *See Blanco*, 997 F.2d at 982 ("[I]t is not the business of our courts to assume a responsibility for supervising the integrity of the judicial system of another sovereign nation."). Not only considerations of the efficiency of our own judicial system but principles of comity and the self-fulfilling consequences of a pronouncement of deficiency in the quality of justice in another state, compel judicious restraint from our courts in accepting invitations to engage in such value judgments. *See PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 73 (2d Cir.1998); *Blanco*, 997 F.2d at 981; *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 66 (2d Cir.1991); *Pavlov v. Bank of New York Co., Inc.*, 135 F.Supp.2d 426, 433 (S.D.N.Y.2001); *Moscovits v. Magyar Cukor Rt.*, No. 00 Civ. 31, 2001 WL 767004, at *4 (S.D.N.Y. July 9, 2001).

Of course, in appropriate circumstances a determination of inadequacy of another forum, judged by a "complete absence of due process" and an inability of a plaintiff to obtain substantial justice, may be inevitable. *See Panama Processes, S.A. v. Cities Serv. Co.*, 500 F.Supp. 787, 800 (S.D.N.Y.1980), *aff'd*, 650 F.2d 408 (2d Cir. 1981); *see also Rasoulzadeh v. Associated Press*, 574 F.Supp. 854, 861 (S.D.N.Y. 1983), *aff'd*, 767 F.2d 908 (2d Cir.1985); *Canadian Overseas Ores Ltd. v. Compania De Acero Del Pacifico, S.A.*, 528 F.Supp. 1337, 1342 (S.D.N.Y.1982), *aff'd*, 727 F.2d 274 (2d Cir.1984). But Monde Re has produced no compelling evidence to persuade the Court that the petition at hand presents such an exceptional case.

The general accusations Monde Re levels against Ukraine's legal system, and the concerns it expresses about its prospects of obtaining a fair hearing in Ukraine, hardly match the obstacles to justice encountered by an American company in "courts administered by Iranian Mullahs" in the early 1980's. *See Rasoulzadeh*, 574 F.Supp. at 861. Nor does anything Monde Re adduces compare to the questions raised in *Canadian Overseas* about the independence of a Chilean judiciary controlled by the ruling military junta. *See* 528 F.Supp. at 1342.

Moreover, it may be that—in appropriate cases—an assessment of insufficiency of a foreign forum may be unavoidable, indeed perhaps demanded, to render justice in a case involving United States parties or interests with the substantial ties to the United States contemplated by the FSIA. But such a pronouncement may be entirely gratuitous and impolitic in the context of advancing the cause of foreign interests in our courts in matters with no connection whatever with the United States, and especially where, as here, the justice system that would be impugned as deficient happens to be that of the sovereign state named as the principal respondent in the action.

■ Monde Re also claims Ukraine is an inadequate forum because if it receives a favorable decision in the Ukrainian courts, it would not be able to execute against the assets of Naftogaz or the Ukrainian government. *See* Butler Decl., ¶¶ 57–58. Monde Re's remark, however, that state immunity is "common ground" is based solely on its assertion that Ukrainian law "has on the whole followed Soviet legal doctrine." Petitioner's Memo at 19. Such speculation is insufficient to defeat a

determination of an adequate alternative forum.

Furthermore, this objection is belied by the evidence in the record indicating that Ukrainian law *does* provide for the execution of a judgment against government property. *See* Kovtunkuk Aff., ¶ 6; Kovtonuk Supp. Aff., ¶¶ 12–13 (citing Article 34 of the Law of Ukraine which states that "Ukraine as a state shall be responsible by its property in full before foreign economic entities and foreign subjects of business activity for all its actions that contradict the current laws of Ukraine and cause losses, moral damage, [and] lost profit to these subjects . . . ."). Based on the foregoing, the Court concludes that Ukraine is an adequate alternative forum.

### 2. *The Gilbert Factors*

 Defendants usually have the burden of overcoming a strong presumption in favor of a plaintiff's choice of forum by establishing that the factors propounded by *Gilbert* tilt strongly in favor of the alternative forum. *See Reyno,* 454 U.S. at 255–56, 102 S.Ct. 252; *R. Maganlal & Co. v. M.G. Chem. Co., Inc.,* 942 F.2d 164 (2d Cir.1991). A foreign plaintiff's choice of forum, however, is entitled to less deference. *See Reyno,* 454 U.S. at 256, 102 S.Ct. 252 (emphasizing that this rule is not intended to disadvantage foreign plaintiffs but rather reflects a realistic prediction of the ultimate convenience of the forum); *Murray v. British Broadcasting Corp.,* 81 F.3d 287, 290 (2d Cir.1996); *see also Gould,* 853 F.2d at 454 ("different principles regarding *forum non conveniens* apply when a case involves a United States citizen suing a foreign state, than when a foreign citizen attempts to avail himself of a United States forum."). As a company incorporated under the laws of Monaco, acting in this lawsuit as the subrogee to a

Russian company, Monde Re is not entitled to the standard deference.

#### a. *The Private Interest Factors*

 The Court must consider the following private interests of the litigants: (a) the ease of access to evidence; (b) the availability of compulsory process; (c) the cost for cooperative witnesses to attend trial; (d) the enforceability of a judgment; and (e) all other practical matters that might shorten any trial or make it less expensive. *See Gilbert,* 330 U.S. at 508, 67 S.Ct. 839; *Ilusorio,* 103 F.Supp.2d at 675–76.

Monde Re claims that these factors cannot weigh in favor of dismissal in this case because "we are not dealing with a potential trial but with a summary proceeding to confirm an arbitral award." Petitioner's Memo at 20. If this contention were true, these factors would be neutral in the balance of this consideration. But Monde Re's characterization is at odds with its own petition, which seeks to prove that Ukraine is responsible for Naftogaz's actions. *See* Pet., ¶¶ 24–32.

 Such an examination would no doubt require extensive discovery and an evidentiary proceeding before a court that would be the functional equivalent, at the very least, of a bench trial. It is not disputed that all sources of proof relevant for this purpose—witnesses and documents—are located outside of the United States, where the documents are in the Ukranian language and the witnesses are beyond the subpoena power of this Court and cannot be compelled to appear at a proceeding in the United States.

In addition, it is not clear that Naftogaz has any assets in the United States from which Monde Re could recover. Monde Re claims that Naftogaz deposits funds in United States banks. *See* Petitioner's Memo at 16. But Monde Re's own source

declares something entirely different—that Ihor Bakai, Naftogaz's chairman in 2000, simply transferred money through a United States bank account for his own personal use. *See* Hardison Decl., ¶ 81. There is no evidence before the Court, however, to suggest that the arbitral award—if confirmed here—would be easier to enforce against Ukraine in the United States rather than in Ukraine. Finally, the Court finds that other practical matters and judicial economy would be well served by having this case litigated in Ukraine.

On the present record, the Court concludes that the balance of private interest factors weighs heavily in favor of dismissal.

b. *The Public Interest Factors*

 The public interest factors to be weighed by the Court include: (a) administrative difficulties relating to court congestion; (b) imposing jury duty on citizens of the forum; (c) having local disputes settled locally; and (d) avoiding problems associated with the application of foreign law. *See Gilbert*, 330 U.S. at 508–09, 67 S.Ct. 839; *Ilusorio*, 103 F.Supp.2d at 678.

First, the Ukranian courts appear no more congested than the busy courts in this District. Second, there is a significant interest in having localized matters decided at home with local law governing the case. *See Ilusorio*, 103 F.Supp.2d at 678. Moreover, "there is a legitimate interest in ensuring that disputes with little connection to the district be litigated elsewhere." *CCS Int'l, Ltd. v. ECI Telesystems, Ltd.*, No. 87 Civ. 4646, 1998 WL 512951, at *10 (S.D.N.Y. Aug.18, 1998).

In this case, the Court finds no connection between the dispute herein and New York or the United States, other than the signature of the United States on the Convention. On the other hand, this action is tied inextricably to the interests of the State of Ukraine. As Ukraine pointedly notes, "the United States has little or no interest in adjudicating this dispute between a citizen of Monaco and citizens of Ukraine, concerning a contract between a Ukranian citizen and a Russian citizen, raising issues of corporate relationships under Ukranian law." Ukraine's Memo at 21.

 Finally, Monde Re, citing to Fed. R.Civ.P. 44.1, asserted in its petition that it intended to raise issues concerning the law of Ukraine in connection with this matter (*see* Pet., ¶ 33), and Russian law "is the law chosen under the Contract." Declaration of Peter Maggs, sworn to Mar. 26, 2000, ¶¶ 10–16, 25–33; Hardison Decl., ¶¶ 43–47, 50–63. Although reluctance to apply foreign law is not dispositive, courts have a legitimate interest in avoiding the difficulty with questions of conflicts of law and the application of foreign law. *See Boosey & Hawkes Music Publishers Ltd. v. Walt Disney Co.*, 145 F.3d 481, 491 (2d Cir.1998). Here, Ukraine has a great interest in applying its own laws, especially with respect to establishing the ownership interests of Naftogaz, while this Court has an interest in avoiding the intricacies attendant to the application of Ukrainian law. Accordingly, the Court concludes that public interest concerns also weigh heavily in favor of dismissal of the case.

### CONCLUSION AND AMENDED ORDER

For the reasons stated above, it is hereby

**ORDERED** that the Court's July 31, 2001 Order is amended to incorporate the discussion in this Decision and Amended Order; and it is further

**ORDERED** that Ukraine's motion to dismiss on forum non conveniens grounds

[## 14, 15, 16, 32, 33] is granted; and it is further

**ORDERED** that, in view of the dismissal of this case on the ground of forum non conveniens, determination of Naftogaz's motion to dismiss [## 12, 13, 31] is rendered moot and should be removed from the Court's motion docket; and it is finally

**ORDERED** that the time to file an appeal from this Decision and Amended Order shall be extended, upon a request complying with Rule 4(a)(5) of the Federal Rules of Appellate Procedure, to thirty (30) days from the date of this Decision and Amended Order.

The Clerk of Court is directed to close this case.

**SO ORDERED.**